# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 08-1159

**CAPITOL ANESTHESIA GROUP, P.A.**

**VERSUS**

**GUS WATSON**

**********

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF CATAHOULA, 20,348 "B"
HONORABLE LEO BOOTHE, DISTRICT JUDGE

**********

**J. DAVID PAINTER**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, J. David Painter, and Shannon J. Gremillion, Judges.

**AFFIRMED AS AMENDED.**

Gremillion, Judge, concurs in the result and assigns written reasons.

**Jon K. Guice**
**Linda K. Ewbank**
**1881 Hudson Circle**
**Monroe, LA 71201**
**Counsel for Defendant-Appellee:**
      **Gus Watson**

**Marjorie G. O'Connor**
**Stanley K. Hurder**
**Angela P. McCulloch**
**Bon Carre Business Center, Suite 400**
**7389 Florida Boulevard**
**Baton Rouge, LA 70806**
**Counsel for Third Party Defendant-Appellant:**
      **Office of Group Benefits**

**PAINTER, Judge.**

Office of Group Benefits (OGB), Third Party Defendant-Appellant, appeals the trial court's grant of summary judgment in favor of Gus Watson, Third Party Plaintiff-Appellee. For the following reasons, we affirm the trial court's grant of summary judgment and amend the judgment to reflect that interest on penalties and attorney's fees is due from the date of judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

This matter has previously been before us on appeal of another issue. *Capitol Anesthesia Group, P.A. v. Watson*, 05-1020 (La.App. 3 Cir. 3/1/06), 923 So.2d 881. In that opinion, we stated the facts as follows:

> The third-party plaintiff in this litigation, Gus Watson, underwent gastric bypass surgery in October of 1995. At that time, he was an employee of the Catahoula Parish School Board and was covered by a plan of health insurance administered by OGB. Prior to the surgery, he requested that OGB pre-approve the procedure, but OGB declined to do so, taking the position that the procedure was to address an obesity problem not covered by the benefit plan. Despite OGB's position with regard to the payment of benefits, Mr. Watson proceeded with the surgery.

> Subsequent to the surgery, various medical providers filed claims with OGB, seeking payment of their claims. OGB refused to pay these claims, relying on its position that its group plan did not cover services, supplies, or treatment in connection with, or related to, obesity.

> After having its claim rejected by OGB, one medical provider, Capitol Anesthesia Group, P.A. (Capitol Anesthesia), made demand on Mr. Watson for payment. When Mr. Watson failed to pay the claim, Capitol Anesthesia instituted suit against him, seeking to recover the amount due ($931.00), together with attorney fees, legal interest, and costs of court. Capitol Anesthesia brought this suit in Catahoula Parish, Mr. Watson's domicile, on February 24, 1998.

> Mr. Watson answered the suit in March of 1998 and incorporated in his answer a third-party demand against State Employees Group Benefits Program, the predecessor of OGB. Over five years later, on May 12, 2003, OGB filed its answer to the third-party demand.

1

At a May 17, 2004 pretrial conference, the trial court scheduled the trial on the merits for November 15, 2004. On June 28, 2004, Capitol Anesthesia mailed to the clerk's office a motion and order to dismiss its suit with prejudice. In the cover letter accompanying the motion and order, Capitol Anesthesia's counsel stated in part that it had settled with Mr. Watson "as per a compromise settlement paid by Office of Group Benefits." Although the motion and order reflect a filing date of June 30, 2004, the trial court has yet to execute the order of dismissal contained in the motion to dismiss. Additionally, the trial court minutes fail to reflect any action by the trial court in open court dismissing Capitol Anesthesia's suit.

*Id*. at 882 (footnotes omitted).

We note that Capitol Anesthesia has filed a brief in this appeal stating that it "has no further interest or claim in the litigation, nor does it take a position for the remaining litigants" and that it desired to be dismissed from this appeal "without prejudice to the remaining litigants." There is still no signed judgment from the trial court dismissing Capitol Anesthesia, despite its having filed a motion and order for dismissal.

We ultimately affirmed the trial court's denial of OGB's exception of venue and motion to dismiss. *Id*. After that appeal was completed, Watson filed a motion to re-fix the hearing on his previously filed motion for summary judgment on the issues of coverage, the medical bills owed, and penalties and attorney's fees. The trial court granted summary judgment as to coverage and awarded $26,179.18 for the medical bills. The trial court also awarded penalties in the amount of $26,179.18 and "reasonable attorney fees" pursuant to La.R.S. 22:657(A). For the following reasons, we amend and affirm the trial court's judgment.

**DISCUSSION**

Our review of this matter is de novo, using the same criteria as the trial court. *Hines v. Garrett*, 04-806 (La. 6/25/04), 876 So.2d 764. We must determine whether

2

any genuine issues of material fact exist and whether the movant, Watson, is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B) and (C). In the case sub judice, the inquiry involves two questions: (1) whether the exclusion is clear and unambiguous; and (2) whether the exclusion applies to the facts of this case.

> Ambiguous terms in an insurance contract are construed liberally in favor of the person claiming coverage. *Westerfield v. LaFleur*, 493 So.2d 600 (La.1986). An ambiguity in an insurance policy is said to exist when the pertinent provision can be reasonably construed in two different ways. *McCarthy v. Berman*, 95-1456 (La.02/28/96), 668 So.2d 721. . . .

> The interpretation of an insurance policy is usually a legal question that can be properly resolved by a motion for summary judgment. *Miller v. Superior Shipyard and Fabrication, Inc.*, 01-2907, p. 4 (La.App. 1 Cir. 08/20/03), 859 So.2d 159, 162, *writ denied*, 03-2643 (La.12/12/03), 860 So.2d 1159.

*Proshee v. Shree, Inc.*, 04-1145, pp. 3-4 (La.App. 3 Cir. 2/2/05), 893 So.2d 939, 942.

OGB contends that the following exclusion contained in the policy applies such that the charges for Watson's gastric bypass procedure were not covered:

VIII. <u>EXCEPTIONS AND EXCLUSIONS FOR ALL MEDICAL BENEFITS</u>

No benefits are provided under this contract for:

. . . .

AA. Services, supplies, or Treatment in connection with or related to obesity; surgery for excess fat in any area of the body; resection of excess skin or fat following weight loss or pregnancy.

Watson, on the other hand, contends that the gastric bypass procedure was performed for the treatment of several life-threatening conditions, all of which OGB admits to have been medically necessary. Specifically, Watson suffered from a stroke, high blood pressure, high cholesterol, sleep apnea, a severely inflamed gallbladder (which was removed during the surgery), and a congenital urethra defect

3

(which was repaired during the surgery).  At the time of the surgery in 1995, Watson

weighed 467 pounds.  Watson contended, and the trial court agreed, that the term "in

connection with or related to obesity" as found in the exclusion is ambiguous and that

OGB's interpretation of said term was ambiguous in that some claims were paid while

others were denied.

Nancy Baker, the assistant manager of the claims processing department of

OGB, was deposed, and her deposition was submitted into evidence by Watson in

support of his motion for summary judgment.  She testified as follows:

> Q: Okay.  Let's say various members have high blood pressure. Would the benefit plan, as it existed in October of '95, have provided coverage for the treatment of high blood pressure?
>
> A: Yes.
>
> Q: Gallbladder, inflamed gallbladder conditions, which ultimately may require removal of the gallbladder, would the plan have provided coverage for that type treatment?
>
> A: Yes.
>
> Q: For the actual removal of the gallbladder if indicated?
>
> A: Yes.
>
> Q: What about congenital problems with the urethra or the kidneys; would the plan, as it existed in October of '95, have covered those types of conditions?
>
> A: Yes.
>
> Q: High cholesterol and triglycerides, would the plan as it existed in October of '95 have covered the condition or those conditions?
>
> A: Yes.
>
> Q: Stroke and other cardiovascular-type accidents?
>
> A: Yes.

4

Q:  The treatment of heart conditions, erratic heartbeat and other ailments of the heart, would the plan have covered that?

A:  Yes.

Q:  Now, in October of '95, if a patient submitted a claim for high blood pressure medication or some other method of treatment for high blood pressure, what steps would the group have taken to determine whether or not the person's weight caused or contributed to that condition?

A:  It would have to be a secondary diagnosis. It would have to be one of the listed diagnoses on the claim that was submitted for payment.

Q:  So, for instance, if a member of the group submitted a pharmacy bill for blood pressure medication, would the group pay that, or would they ask questions?

A:  A drug bill they would pay. A doctor bill that came in, if it were just a diagnosis of high blood pressure, we would, of course, pay it. If it had obesity as a secondary diagnosis or any other diagnosis on the plan, we would request medical records to determine what the primary treatment was for, what he actually treated.

Q:  Okay. If a member of the group back in '95 was diagnosed with high blood pressure, seriously high blood pressure, and the doctor was of the opinion that his obesity was causing that high blood pressure, would the group pay for the treatment of the high blood pressure?

A:  If he were treating the high blood pressure, yes, we would pay for it.

Q:  Now, the next questions are going to be the same question, but let's assume that the person had high cholesterol or triglycerides that the healthcare provider said this is related to the person's obesity, and I recommend a particular treatment for that. Would the group pay for that?

A:  If they were treating that, those two diagnoses.

Q:  Would the same apply to any other condition that was related to obesity; if the doctor was treating that, then the plan would cover it?

A:  Yes.

The sworn statement of the physician who performed the gastric bypass, Dr. Kerry L. Ozment, was also submitted into evidence, over OGB's objection. He testified that prior to the surgery, Watson required dilation and the placement of a catheter to relieve obstructive uropathy caused by a congenital hypospadias (a condition where the opening of the urethra, instead of being at the end of the penis, is beneath it). He further testified that during the surgery, he removed Watson's gallbladder which was chronically inflamed. He further testified that the gastric bypass procedure was medically necessary.

The trial court, in its written reasons for judgment, stated: "[I]t is difficult to understand the distinctions being drawn by the Group in order to, on one hand, claim that the treatment of some conditions cause[d] by and related to obesity are covered under the Group's plan while on the hand denying others." Based on this, the trial court found that the policy exclusion was ambiguous and that there was a reasonable interpretation of the policy that afforded coverage to Watson.

It is well-settled that if the language of the exclusion at issue is subject to two or more reasonable interpretations, then the interpretation which favors coverage must be applied. *Garcia v. St. Bernard Parish Sch. Bd.*, 576 So.2d 975 (La.1991). We agree with the trial court that the language of the exclusion is ambiguous and, therefore, affirm the trial court's grant of summary judgment in favor of Watson.

OGB next contends that the trial court erred in awarding medical expenses in the amount of $26,179.18 on the basis that Watson is only entitled to recover the amount of benefits due rather than the total amount of medical bills and that there appears no evidence of the amount of the benefits due in the record. Louisiana Revised Statutes 22:1821(A) provides, in pertinent part, as follows:

6

All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B, shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist. The insurer shall make payment at least every thirty days to the assured during that part of the period of his disability covered by the policy or contract of insurance during which the insured is entitled to such payments. Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court.

Watson's affidavit attesting to the amount of medical bills he paid does appear in the record, and OGB submitted no evidence to the contrary to show that the amount of benefits due was less than the amount paid. We find no error in the trial court's grant of $26,179.18 in medical bills to Watson.

OGB also contends that its reasonable interpretation of the plan document precludes an award for penalties and attorney's fees. We have already found that the exclusion was ambiguous. Furthermore, we note that:

> An insurer takes the risk of misinterpreting its own policy provisions. Such error will not be considered reasonable grounds for delaying the payment of benefits. Even when the issues involved are *res nova*, an insurer may be cast for penalties. *Coker v. American Health and Life Insurance Company*, 525 So.2d 130 (La.App. 3 Cir.1988). The issue of whether just and reasonable grounds exist is a question of fact. The trial court's factual determination will not be disturbed on appeal unless clearly wrong. *Lucito v. Louisiana Hospital Service, Inc.*, 392 So.2d 700 (La.App. 3 Cir.1980).

*Holland v. Golden Rule Ins. Co.*, 96-264, p. 6 (La.App. 3 Cir. 10/9/96), 688 So.2d 1186, 1189-90. We find that the trial court was not clearly wrong in its finding that there was no just and reasonable grounds for delay in this case and affirm the award of penalties in the amount of $26,179.18. As the trial court awarded only a "reasonable amount" for attorney's fees, which was to be agreed upon by the parties

7

and set by the trial court in the event that no agreement could be reached, we note that the appeal of the amount of attorney's fees, if set by the trial court, is reserved to OGB.

With respect to OGB's complaint that interest on penalties and attorney's fees is due only from the date of judgment, rather than the date of judicial demand, we agree and amend the judgment to reflect that interest on penalties and attorney's fees is due only from the date of judgment.

## DECREE

The trial court's grant of summary judgment in favor of Defendant and Third Party Plaintiff-Appellee, Gus Watson, is affirmed as amended. Costs of this appeal are assessed against Third Party Defendant-Appellant, Office of Group Benefits.

**AFFIRMED AS AMENDED.**

COURT OF APPEAL

THIRD CIRCUIT

08-1159

CAPITOL ANESTHESIA GROUP, P.A. V. GUS WATSON

GREMILLION, Judge, concurs with written reasons.

I concur with my colleagues in their conclusions. The trial court was right. The "obesity" exclusion in the subject policy is simply too problematic to enforce. Furthermore, the plaintiff was entitled to the penalties and attorney's fees awarded by the trial court. However, I do wish to provide my specific reasons for so ruling.

**Summary Judgment**

The pertinent policy language purports to disallow "treatment" that is provided "in connection with or related to obesity." However, the policy undisputedly provides coverage for such maladies as stroke, high blood pressure, high triglycerides, and high cholesterol.

Thus, there is no problem interpreting this exclusion when the medical evidence clearly indicates that the treatment is being provided for only "obesity." Such treatment would not be covered. The policy is also clear in a case where the medical evidence shows the treatment is strictly for high blood pressure, for example. In such a case, the treatment would clearly be covered.

A problem arises, however, when the medical records indicate that the treatment is being given not only to treat obesity but also to treat a condition or disease covered by the policy. That, of course, is exactly what occurred in this case.

If this exclusion or some other part of the policy would have clearly advised

1

the plaintiff how OGB would deal with such a circumstance, I would have no trouble enforcing the provision. Unfortunately, there is no such rule or procedure provided for in the policy.

As a result of this deficit in the policy, OGB was left to develop its own procedures for dealing with such cases. Ms. Nancy Baker, an Assistant Manager with the Claims Processing Department of OGB, testified that she would review the medical records and make her own determination as to what the proposed treatment was "primarily treating." However, she also advised that she would not allow payment for a gastric bypass, even if the medical records indicated that this surgery was for a covered condition other than obesity. Ms. Baker would reject such a claim based on her own notion that gastric bypass would only treat or affect those covered conditions by first causing weight loss.

There is nothing in the policy that allows OGB to withhold coverage for the treatment of otherwise covered ailments merely because its employees determined that the treatment of those ailments were not the "primary" focus of the treatment.

Additionally, nothing in the record suggests that Ms. Nancy Baker is anything other than a fair and competent person. However, the record is equally devoid of any evidence to suggest that she has either the authority or the expertise to determine what a physician or surgeon is "primarily treating."

Ultimately, I would be in favor of enforcing this exclusion if the policy explained to insureds with clarity, how OGB would respond in the very frequent case of a multiple diagnosis that includes both clearly excluded diseases such as obesity and clearly covered diseases such as those suffered by the plaintiff. The policy is not merely unclear or ambiguous as to that point. It is silent. As the majority properly

2

points out, that ambiguity and silence must be interpreted in favor of coverage. Accordingly, summary judgment was proper.

**Penalties and Attorney's Fees**

The McKenzie and Johnson treatise on insurance law and practice states that there are two common reasons for the award of penalties and attorney's fees in the realm of health and accident insurance. One is "the failure of an insurer to investigate a claim timely or thoroughly." 15 La.Civ. L. Treatise: Insurance Law and Practice. The other is "an unreasonable policy interpretation by the insurer." [Section 293] *Id.*

In this case, penalties and attorney's fees should not be awarded based on an unreasonable policy interpretation. As the majority points out, the interpretation of this obesity exclusion is res nova. Furthermore, OGB had a right to test whether the courts would enforce an obesity exclusion, particularly when the plaintiff weighed in excess of 400 pounds and the treatment involved was gastric bypass: a procedure designed to restrict food intake and reduce caloric absorption in the case of severe obesity.

On the other hand, OGB clearly failed in its duty to investigate this claim timely and thoroughly. The trial court explained the defendant's completely unacceptable feet dragging as follows:

> In December 1995, Mr. Watson asked to appeal the Group's denial of coverage, as was permitted by the Plan Document (Third Party Plaintiff's Exhibit 2). Pursuant to the Group's own rules and regulations, the appeal was to be set for a full evidentiary hearing "as soon as reasonably possible" (page 48 of Plan Document). Mr. Watson began making requests that his hearing be set, but the Group did not set the hearing until May of 1997. This delay occurred despite the fact that Mr. Watson had submitted approximately 13 written requests that the hearing be set. Even then, two of the Group's witnesses were not available at the hearing, thus requiring the evidence to be held open. (Neither a transcript nor a copy of the tapes from the above-described hearing have been produced by Defendant prompting Mr. Watson's

3

concern that such items may have been lost.)

Even though the record was held open, over the next four years the Group refused to make its witnesses available for depositions to complete the appeal despite over 15 separate written requests and pleas to do so. In fact, during that prolonged delay, defendant's medical review officer changed. The witnesses, including the new review officer, were ultimately made available on May 15, 2001 – almost five years after the hearing began. In addition to the witness problems, during the dely caused by the Group, its own hearing process was changed without any notice of those changes being provided to Mr. Watson. The change in the Group's procedures eliminated any evidentiary hearings as part of the appeal process.

In addition, as late as 2003, Mr. Watson was advised of the fact that the hearing procedures had changed, that his claim was being reviewed, and that a decision would follow shortly. The Court has been provided with no information to suggest that such a review ever occurred. Despite promises by the Group to hear his appeal (even after litigation commenced), Mr. Watson has waited almost 13 years to have his claim reviewed. In the meantime, he has been sued by at least one health care provider and has managed to pay his medical debts, while at the same time incurring damage to his credit history.

In short, penalties and attorney's fees are not due here because the OGB lost its right to enforce a policy provision. Those penalties and fees are due because it took the OGB thirteen years to resolve this matter.